**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------x

CONCRETE CAPITAL, LLC,

                    Appellant,

     v.

OLYMPIC PROPERTY PARTNERS, LLC,

                    Appellee.

-------------------------------------------------------------------------x

Index No.: 16-cv-01646-KMK

---

## APPELLE'S ANSWERING BRIEF

---

Daniel E. Silverman
Albert Sardar
SILVERMAN & SARDAR LLP
2 Rector Street, Suite 1203
New York, New York 10006
Telephone: (212) 321-3190

*Counsel for Appellee*

# TABLE OF CONTENTS

I  STATEMENT OF THE CASE ............................................................................. 1

  A.  INTRODUCTION ................................................................................................ 1
  B.  BACKGROUND ON APPELLEE (THE ALLEGED DEBTOR) ....................................... 1
  C.  NATURE OF THE CASE, PROCEDURAL HISTORY AND STATEMENT OF FACTS ......... 2

II  SUMMARY OF ARGUMENT ........................................................................ 8

III  APPLICABLE STANDARD OF REVIEW ...................................................... 9

IV  ARGUMENT ................................................................................................. 10

  A.  EXTANT 11 U.S.C. § 303 JURISPRUDENCE SUPPORTS THE BANKRUPTCY COURT'S
     INTERPRETATION OF "CONSENT" AND ITS RESULTING ORDER GRANTING ALLEGED
     DEBTOR'S MOTION TO DISMISS, DISMISSING THE PETITION AND AWARDING FEES AND
     COSTS   10
  B.  PLAIN MEANING OF A STATUTE MUST BE IGNORED WHERE CONSEQUENCE OF APPLICATION
     THEREOF RESULTS IN ABSURDITY ................................................................. 19
  C.  BANKRUPTCY COURT'S DISMISSAL ORDER SHOULD BE AFFIRMED AS ABSTENTION WAS AN
     INDEPENDENTLY APPROPRIATE GROUND UPON WHICH TO PREMISE DISMISSAL OF
     APPELLANT'S INVOLUNTARY PETITION ........................................................... 26

V  CONCLUSION ............................................................................................. 32

TABLE OF AUTHORITIES

PAGE(S)

Cases

74 U.S. (7 Wall.) 482 (1868) ................................................................................................20, 21

*Armstrong Paint &Varnish Works v. Nu-Enamel Corp.*,
   305 U.S. 315 (1938) ........................................................................................................20, 21

*Campbell v. Greer*,
   831 F.2d 700 (7th Cir. 1987) ...........................................................................................22, 23

*Church of the Holy Trinity v. United States*,
   143 U.S. 457 (1892) ...............................................................................................................21

*Green v. Bock Laundry Mach. Co.*,
   490 U.S. 504 (1989) ........................................................................................................passim

*Hawaii v. Mankichi*,
   190 U.S. 197 (1903) ...............................................................................................................21

*In re All Media Properties, Inc.*,
   5 B.R. 126, 6 Bankr. Ct. Dec. (CRR) 586, 2 Collier Bankr. Cas. 2d (MB) 449 (Bankr. S.D. Tex. 1980) .............11

*In re Analytica Wire, Inc.*,
   392 B.R. 618 (2008) ..................................................................................................12, 17, 18

*In re Diloreto*,
   388 B.R. 637 (Bankr. E.D. Pa. 2008) ....................................................................................11

*In re Express Car & Truck Rental, Inc.*,
   440 B.R. 422 (Bankr. E.D. Pa. 2010) ...............................................................................passim

*In re International Mobile Advertising Corp.*,
   117 B.R. 154 (1990) ..................................................................................................12, 17, 18

*In re Jett*,
   206 B.R. 407 (1997) ...............................................................................................................12

*In re Kelton Motors, Inc.*,
   121 B.R. 166 (Bankr.D.Vt.1990) .............................................................................11, 12, 17

*In re Monitor Single Lift I, Ltd.*,
   381 B.R. 455 (Bankr. S.D.N.Y. 2008) ...................................................................................27

*In re Mt. Dairies, Inc.*,
   372 B.R. 623 (Bankr. S.D.N.Y. 2007) ......................................................................27, 28, 30

*In re Persico Contracting and Trucking, Inc.*,
   2010 WL 3766555 (Bankr. S.D.N.Y. 2010)...................................................................27, 28

*In re R. Eric Peterson Construction*,
   951 F.2d 1175 (10th Cir. 1991)...................................................................................passim

*In re S. Cal. Sunbelt Developers, Inc.*,
   608 F.3d 456 (9th Cir. 2010) .........................................................................................14, 19

*In re Tichy Elec. Co.*,
   332 B.R. 364 (2005) ...............................................................................................................12

*In re TPG Troy, LLC*,
   492 B.R. 150 (Bankr. S.D.N.Y. 2013) .....................................................................27, 28, 29

In re United States Lines, Inc.,
   197 F.3d 631 (2d Cir. 1999) .....................................................................................................9

*In re Wolfson*,
   139 B.R. 279 (Bank. S.D.N.Y. 1992)........................................................................................4

*In re Grossinger*,
   268 B.R. 386 (Bankr. S.D.N.Y. 2001) ..............................................................................10, 25

*In re Stern*,
   268 B.R. 390 (Bankr. S.D.N.Y. 2001) ........................................................................10, 25
*KMart Corp. v. Cartier, Inc*.,
   486 U.S. 281 (1988) ....................................................................................................20
Lady Baltimore Foods,
   960 F.2d 1339 (7th Cir. 1992)......................................................................................21
*Public Citizen*,
   491 U.S. ......................................................................................................................20
*Sorrells v. United States*,
   287 U.S. 435 (1932) ....................................................................................................21
*Sturges v. Crowninshield*,
   17 U.S. 122 (1819) ................................................................................................20, 21
*United States v. Bright*,
   24 F. Cas. 1232 (C.C.D. Pa. 1809) ..............................................................................21
*United States v. Brown*,
   333 U.S. 18 (1948) ......................................................................................................21
*United States v. Katz*,
   271 U.S. 354 (1926) ....................................................................................................21

## Statutes

11 U.S.C. § 1104(a)(2) ..........................................................................................................6
11 U.S.C. § 303 ............................................................................................................passim
11 U.S.C. § 305(a)........................................................................................................9, 28
11 U.SC. § 305(a)(1).............................................................................................27, 28, 29
11 U.SC. § 303(i)(2)..........................................................................................................1, 8
28 U.S.C. app. 537 (Supp. II 1990) ......................................................................................22
28 U.S.C. app. 759 (1988) ....................................................................................................22
11 U.S.C. § 305 ..........................................................................................4, 26, 30, 31

## Rules

FED. R. EVID. 609(a) (1988) ..................................................................................................22
Federal Rule of Evidence 609(a) ..............................................................................22, 23, 24
Federal Rule of Evidence 609(a)(1)........................................................................21, 22, 23
Federal Rules of Appellate Procedure 26.1 ............................................................................iv

## Other Authorities

431 ........................................................................................................................................13
*Absurdity and the Limits of Literalism: Defining the Absurd Result Principle in Statutory Interpretation*
   44 AM. U. L. REV. 127 (1994) ..............................................................................passim
Commercial Bankruptcy Litigation § 4:30 ............................................................................26
Commercial Bankruptcy Litigation § 4:37 ............................................................................11
H.R Rep. No. 95-595..............................................................................................................28
*Id.* 430..................................................................................................................................13
J.A. Corry, *Administrative Law and the Interpretation of Statutes*,
   1 U. TORONTO LJ. 286 (1936) ....................................................................................20
S.Rep. No. 95-989 ..................................................................................................................28

## CORPORATE DISCLOSURE STATEMENT

In compliance with the requirements of Federal Rules of Appellate Procedure 26.1, Olympic Property Partners, LLC states that it does not have a parent company, and that there are no publicly held companies that own 10% or more of the stock of Olympic Property Partners, LLC.

Dated: May 4, 2016


OLYMPIC PROPERTY PARTNERS, LLC


By: /s/ Seth G. Weinstein_____
       Seth G. Weinstein

**I      STATEMENT OF THE CASE**

### A.  Introduction

Appellee, Olympic Property Partners, LLC ("Olympic" or Appellee"), by and through its undersigned counsel, respectfully submits this answering brief in opposition to this instant appeal, by Concrete Capital, LLC ("Concrete" or "Appellant"), from that certain *Order Pursuant to 11 U.S.C. §§ 303 and 305 (i) Granting Dismissal (ii) Awarding Fees and Costs But Reserving Decision on Amount of Same and (iii) Reserving Further Decision on Damages Under 11 US.C. § 303(i)(2),* entered by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on January 26, 2016 (Drain, B.J.) (the "Dismissal Order") [Docket No. 28][1] in the subject involuntary chapter 11 bankruptcy case (the "Involuntary Case").

### B.  Background on Appellee (the Alleged Debtor)

Appellee Olympic is an active company which works as part of and in conjunction with a full-service real estate development organization that, through its principals, Weinstein, Friedman and Chalk (collectively, the "Principals"), has for the past three decades engaged in real estate acquisitions, financings and developments across diverse geographical locations.[2]  Olympic has together with this larger organization engaged in real estate development and fee-based projects, ranging in deal size from roughly $50 million up to $1 billion.[3]  These engagements directly and indirectly create and support dozens, if not hundreds, of jobs across multiple related sectors, such

---

[1] Unless otherwise indicated, references to the Involuntary Case or documents therein are to the underlying involuntary bankruptcy case before the Bankruptcy Court, *i.e., In re: Olympic Property Partners, LLC,* Case No. 15-23658 (RDD), which produced this instant appeal, or to the docket therein, respectively.  When applicable, the docket numbers are followed by the relevant page or paragraph number(s) within the referenced documents.  Where references herein are made to documents filed to the appellate docket in this instant appeal, the designation "App. Docket" shall preface such referenced document.

[2] These locations range from Dallas, Texas and Bermuda to Connecticut and New York.  Declaration of Seth G. Weinstein, dated December 11, 2015.  [Docket No. 10, ¶¶ 5-6].

[3] *Id.* at ¶ 7.

as engineering, construction, design, landscaping and architecture. [Docket No. 10, ¶7].  Each of

the Principals serve critical roles, and are vital, in managing and running the business of Olympic.[4]

### C.  Nature of the Case, Procedural History and Statement of Facts[5]

The Involuntary Case was based solely upon a private dispute between Appellant and

Appellee over the validity of a debt and Appellant's efforts to collect on that debt,[6] which arose

over the course of three usurious loan transactions entered into between Appellant and Appellee

during the roughly six month period leading up to the commencement by Appellant of the

Involuntary Case.[7]  Under the first loan transaction, Appellant advanced Appellee $750,000 and

charged Appellee interest[8] in the amount of $250,000 for a 62-day loan (the "July Transaction");[9]

under the second loan transaction, Appellant advanced Appellee $500,000 and charged Appellee

---

[4] *Id.* at ¶ 5.

[5] Although Appellant purports that the facts relevant to this appeal are not disputed, [App. Docket No. 8, p. 5] Appellee in fact disputes many of the facts stated in Appellant's opening brief.  Appellant states that "[r]epayment of the amounts advanced by Concrete to Olympic was secured by personal guarantees executed by the three (3) principal members of Olympic."  [Id.]  In fact there were no separate personal guarantees executed by the principal members of Olympic. Each of the members were co-makers on the loan and executed the loan documents in that capacity.  [Docket No. 10, ¶ 32].  Additionally, Appellant states that "the amounts loaned by Concrete were to be used solely to pay the interest owed to the existing lenders with regard to 'The Olympic' building (a 50 story skyscraper located at 1401 Elm Street, Dallas, Texas).  [App. Docket No. 8, p. 6].  In fact, there was absolutely no restriction placed on the use of the loaned amounts in any of the loan documents.  [Docket No. 23-1, ¶ 18].  Moreover, Appellant states that subsequent to the making of the loan but prior to the filing of the involuntary petition, it "discovered from a news article that Olympic had pulled out of the Elm Street Property deal and that the property was the subject of a pending foreclosure proceeding/sale."  [App. Docket No. 8, p. 6].  Again, these are facts that are fictitious.  Olympic, had not "pulled out" of the Elm Street Project as the news article suggested and there never was a foreclosure sale of the property.  [Docket No. 23-1, ¶¶ 22-23].  Furthermore, although Appellant claims that "[d]espite repeated requests from Concrete, no explanation was provided by Olympic as to what became of the funds advanced by Concrete," [App. Docket No. 8, p. 7] Appellant has never pointed to any obligation, in the loan documents or otherwise that obligates Appellee to account for the use of the amounts loaned.  Finally, Appellant claims to have advised Appellee's counsel on January 4, 2016 by telephone "that it was seriously considering and inclined to support the withdrawal of the Involuntary Petition."  [App. Docket No. 8, p. 7].  In fact this referenced phone call was on the same day that Appellant's counsel emailed Appellee's counsel, January 8, 2016.

[6] *See* Jan. 25, 2016 Tr., 21;11-20; Docket Nos. 20, ¶2; 10, ¶20; and App. Docket No. 8, pp. 5-6.

[7] *See* App. Docket No. 8, pp. 5-6.

[8] Though the loan documents that Concrete Appellant prepared refer to the $250,000 figure as a "fee", rather than *interest*, Appellee refers to this amount as interest above, because well- and firmly-settled New York law considers such "fees" interest when determining whether a loan is usurious.  Docket No. 22, ¶11; *and see* Aff. of Stanley Wolfson, State Court Litigation Docket No. 29, ¶4.

[9] Docket Nos. 10, ¶21; and 22, ¶ 10.

$166,000 of interest[10] for a 74-day loan (the "<u>August Transaction</u>");[11] and under the third loan transaction, Appellant advanced Appellee $700,000 and charged Appellee interest[12] in the amount of $787,878 for a 32-day loan (the "<u>October Transaction</u>").[13]

In the above-referenced loan dispute, Appellant Concrete sought to recover amounts actually advanced to Appellee Olympic under these loan transactions plus additional amounts on account of interest and fees. [Docket No. 22, ¶17]. However, importantly, prior to the commencement by Appellant of the State Court Litigation[14] and Involuntary Case, Appellant notes that Appellee rebuffed Appellant's collection efforts, informing Appellant (which acknowledges receipt of such notice) that the loan transactions were criminally usurious and thus void and uncollectable, and as such would not be repaid. [App. Docket No. 8, pp. 5-6].[15]

Though not disputing the above figures [App. Docket No. 8, p.5] and not contesting that in each loan transaction interest in excess of the legal limit was charged,[16] Appellant nonetheless continued its aggressive efforts to collect on the loans, first by threatening Appellee and its individual principals with business and personal career destruction, [Docket No. 10, ¶37] legal action and criminal prosecution, [Docket No. 10, ¶36] then by commencing the State Court

---

[10] As above, though the loan documents prepared by Appellant Concrete refer to the $166,000 figure as a "fee", rather than *interest*, Appellee refers to this amount as interest, because well- and firmly-settled New York law considers such "fees" interest when determining whether a loan is usurious.

[11] Docket Nos. 10, ¶27; and 22, ¶12.

[12] Finally as above, though the loan documents prepared by Appellant Concrete refer to the $787,878 figure as a "fee", rather than *interest*, Appellee refers to this amount as interest, because well- and firmly-settled New York law considers such fees interest when determining whether a loan is usurious.

[13] Docket Nos. 10, ¶31; and 22, ¶15.

[14] This action was commenced on November 16, 2015 by Appellant Concrete against Appellee Olympic and each of its individual Principals in the Supreme Court of the State of New York, County of New York (Index No. 161804/2015) (the "<u>State Court Litigation</u>"). In the State Court Litigation, Appellant sought to recover $3,153,878 on account of the monies loaned Appellee (under a "loan modification") plus, *inter alia*, fees and other sums under the three loan transactions.

[15] In early November 2015, "Olympic suddenly advised Concrete that the loan amounts would not be repaid on the basis that the interest, charges and fees payable to Concrete were allegedly civilly and criminally usurious. [App. Docket No. 8, pp. 5-6 *citing to* Docket No. 22, ¶16].

[16] State Court Litigation Docket No. 18 pp. 5-6.

Litigation, an action in New York State Supreme Court (on November 16, 2016), and finally by commencing the instant Involuntary Case (on November 19, 2016), additionally applying therein for an order directing the appointment of a chapter 11 trustee over Appellee's estate[17] (on December 11, 2015, with a renewed notice on same filed on December 22, 2015).  [Docket Nos. 7 & 20].

Shortly after Appellant filed its Involuntary Petition, Appellee learned of Appellant's principal's previous misconduct and untruthfulness[18] before this Court and was concerned that same was again presenting in a manifestation presently involving Appellee.

On January 25, 2016, after months of contentious legal battling by and between Appellant and Appellee, conducted through numerous pleadings which form a part of this record on appeal (which included Appellee's motion to dismiss and robust opposition to Appellant's application for the appointment of a chapter 11 trustee and various other replies by Appellee), the Bankruptcy Court was scheduled to hold a hearing on Appellee's Motions (to dismiss under section 303 of title 11 of the United States Code (the "Bankruptcy Code"), or abstain and dismiss under section 305 of the Bankruptcy Code and to extend the automatic stay or otherwise enjoin Appellant from pursuing Appellee's individual principals in the state court litigation during the pendency of the

---

[17] *Application for an Order Directing the Appointment of a Chapter 11 Trustee* (the "Trustee Appointment Motion") [Docket Nos. 7].

[18] Mr. Wolfson, Appellant's principal, engaged in misconduct before this Court during the early 1990's while seeking a discharge of his debts under chapter 7 of the Bankruptcy Code.  Olympic further learned that then Chief Judge Lifland denied Mr. Wolfson's discharge after finding that he:

> engaged in gamesmanship by playing 'catch me if you can' through selective disclosure… [, that he made] repeated misrepresentations…which violated the disclosure requirements of the Bankruptcy Code… [,] displayed an indifference to the bankruptcy process [which resulted] in an inability to achieve an accurate assessment of his financial condition… [, and that he was] not a debtor worthy of a discharge."

*In re Wolfson*, 139 B.R. 279, 289 (Bank. S.D.N.Y. 1992); *aff'd* 152 B.R. 830 (S.D.N.Y. 1993).  The same Mr. Wolfson that had engaged in gamesmanship and selective disclosure ultimately failing to disclose required material information to the bankruptcy court in the 1990's was, through its deficient Involuntary Petition, seeking to commit a perfectly healthy company into chapter 11 bankruptcy on the basis of a known bona fide dispute over a private contract between two parties, the Appellant and the Appellee.

Involuntary Case) and Appellant's motion (for the appointment of a chapter 11 trustee).[19]

However, one week before the scheduled hearing, on January 18, 2016, Appellant notified the

Bankruptcy Court and Appellee that it was all of a sudden acquiescing to Appellant's motion for

---

[19] On November 19, 2015 (the "Filing Date"), Appellant Concrete, as the sole petitioning creditor, commenced the subject Involuntary Case solely against Appellee Olympic by filing an involuntary chapter 11 petition (the "Involuntary Petition") [Docket. No. 1] in the Involuntary Case, notwithstanding Appellant's knowledge of the aforementioned *bona fide* dispute surrounding the loan.  The Involuntary Petition and case was referred to Judge Drain for administration.  Though Appellant Concrete was the sole petitioning creditor and no other creditor joined Appellant's Involuntary Petition, it was not for want of Appellant's numerous active lobbying efforts seeking to recruit other petitioning creditors. [Jan. 25, 2016 Tr. 22;13-22, 29;6-10].

On December 11, 2015, to further increase its loan collection efforts and further pressure Appellee Olympic into paying sums claimed under the loans, Appellant Concrete moved the Bankruptcy Court for the appointment of a chapter 11 trustee to take over Appellee Olympic's business.  *Application for an Order Directing the Appointment of a Chapter 11 Trustee* (the "Trustee Appointment Motion") [Docket No. 7].

On December 14, 2015 and in response to Appellant Concrete's Involuntary Petition, Appellee Olympic filed its motion to dismiss the Involuntary Petition and for an award of attorneys' fees and damages.  *Motion of Alleged Debtor for entry of an Order Dismissing the Involuntary Petition and Awarding Damages, Including Fees* (the "Motion to Dismiss")  [Docket No. 8].  In its Motion to Dismiss, Appellee moved for, *inter alia*, dismissal of the Involuntary Petition and Involuntary Case pursuant to sections 303 and 305 Bankruptcy Code.  Appellee's Motion to Dismiss highlighted numerous deficiencies with respect to the substance of the Involuntary Petition and the impropriety of using the Bankruptcy Court as a collection agency in the subject private two-party dispute.

Also on December 14, 2015, in response to the increased pressure Appellant Concrete exerted on Appellee Olympic by Appellant Concrete's commencement of the State Court Litigation against Appellee and its three Principals (each a co-maker of the notes) concurrently with the Involuntary Case, the Appellee sought an extension of the automatic stay, or in the alternative, an injunction against the continued prosecution of Appellee Olympic's Principals in the State Court Litigation to prevent the otherwise certain prejudice to the Appellee-Alleged Debtor that would have followed.  *Motion of Alleged Debtor to Extend the Automatic Stay or, in the Alternative, for Injunctive Relief Enjoining Prosecution of Certain Pending Litigation against Alleged Debtor's Principals* (the "Motion to Extend") [Docket No. 14].

Finally, also on December 14, 2015, due to the detrimental impact the involuntary filing was having on Appellee Olympic's business, coupled with the general difficulty in scheduling available hearing dates near year-end, and the Bankruptcy Court's particularly full schedule and the close proximity of the responsive deadlines approaching in the State Court Litigation, Appellee sought to shorten notice and expedite a hearing on its Motion to Dismiss.  *Motion of Alleged Debtor to Shorten Notice on Motion to Dismiss and Motion to Extend the Automatic Stay* (the "Motion to Shorten") [Docket No. 16].  In its Motion to Shorten, the Appellee argued that unless notice pursuant to 9006(c) is shortened and the court orders a hearing to determine the Alleged Debtor's Motions prior to December 17, 2015, or, at a minimum, a date prior to the end of the year, the Alleged Debtor would be faced with a Hobson's choice: either take advantage of the protections of the automatic stay, sit on the sidelines while the State Court Litigation continues against the Principals, and allow the Alleged Debtor to be saddled with whatever claims and defenses are waived, evidence generated, findings made, and decisions rendered; or participate in the defense of the cases to protect its litigation interests and lose the benefits of the automatic stay, along with a depletion of its resources in the State Court Litigation.

On December 22, 2015, Appellant Concrete pressed forward with its use of the Bankruptcy Court in seeking collection on its loans when it filed the *Notice of Motion of Concrete Capital, LLC for an Order Directing the Appointment of a Chapter 11 Trustee*, which noticed a hearing on Appellant's then Trustee Appointment Motion for January 25, 2016.  [Docket No. 20].

Appellee's Motion to Dismiss and Motion to Extend were also scheduled to be heard on January 25, 2016, with objection deadlines of January 18, 2016. [Docket Nos. 19 & 20].  As of the Filing Date through January 17, 2016, the stage was, if not fully, then partly, set for a very contentious battle between Appellee and Appellant over Appellee Olympic's Motion to Dismiss and Motion to Extend and Appellant Concrete's Trustee Appointment Motion.

dismissal of the Involuntary Petition under sections 303 and 305 of the Bankruptcy Code, though it continued to contest Appellee's request for fees and damages under section 303(i) thereof, and was thus no longer pursuing its Trustee Appointment Motion either. [Docket No. 22, ¶1-2]. *Petitioning Creditor's Statement: (A) Consenting to Dismissal or Abstention with regard to the Involuntary Case; and (B) in Opposition to Alleged Debtor's Request for Damages, Including Attorneys' Fees* (the "Statement of Consent") [Docket No. 22].

In its Statement of Consent, Appellant expressly stated that "Concrete consents to and requests the dismissal of the Involuntary Case." [Docket No. 22, ¶ 1]. Appellant further stated therein that "Concrete's co-counsel conferred with counsel to the Alleged Debtor regarding a consensual dismissal of the Involuntary Petition. **However, the Alleged Debtor would not consent thereto absent Concrete's consent to certain conditions and limitations on further actions outside of this Court which were untenable to Concrete**." [Docket No. 22, ¶1 FN 1]. Appellant's sudden about-face in position rendered Appellant's motion for the appointment of a chapter 11 trustee moot. Between January 19, 2016 and the January 25, 2016 hearing the parties each filed a series of respective remaining oppositions and replies to each other's pleadings.[20]

Thus, the focus of the January 25, 2016 hearing was Appellee's Motion to Dismiss. During the hearing, Judge Drain found *inter alia*: (i) that Appellant lacked an appropriate bankruptcy purpose in commencing the Involuntary Case – "[t]here were serious problems with the merits of the involuntary petition…[and]…this appears to me to be pretty clearly a case where

---

[20] On January 19, 2016, Appellee filed *Alleged Debtor's Objection to Petitioning Creditor's Motion Pursuant to 11 U.S.C. § 1104(a)(2) for an Order Directing the Appointment of a Chapter 11 Trustee*. [Docket No. 23].
On January 22, 2016, Appellant filed *Petitioning Creditor's Reply to Alleged Debtor's Objection to Motion for Appointment of a Chapter 11 Trustee*. [Docket No. 25].
    On January 22, 2016, Appellee filed its *Reply to Petitioning Creditor's Statement: (A) Consenting to Dismissal or Abstention with regard to the Involuntary Case; and (B) in Opposition to Alleged Debtor's request for Damages, Including Attorneys' Fees*. [Docket No. 26]

it's a two-party dispute over a collection" [Jan. 25, 2016 Tr., 43;19-24];[21] (ii) that "there was really nothing here to benefit anyone other than [Appellant Concrete] when it had a pending action to enforce the debt in state court" [Jan. 25, 2016 Tr., 44;1-3]; (iii) "that there's clearly a dispute over how much to pay, *if anything*, in regard to this loan" [Jan. 25, 2016 Tr., 38;8-9]; (iv) that:

> [Appellant Concrete] doesn't particularly have much of an equities on its side, and indeed one can argue that ***when looking to collect so obviously a criminally usurious claim in state court*** [the Appellant-Petitioner Concrete] might have concluded that putting the pressure on [Appellee-Alleged Debtor Olympic] ***in an involuntary two-party bankruptcy case*** would be a smart tactical move, although ultimately I think the creditor saw the light and decided it wouldn't be.

[Jan. 25, 2016 Tr., 44;15-21] (emphasis added); (v) that "there doesn't seem to have been any due diligence [done by Appellant Concrete] as to whether there are any other creditors who aren't…being [paid] * * * "you didn't do any due diligence as to that" [Jan. 25, 2016 Tr., 37;6-7 and 38;18-20]; (vi) "it's probably [Appellee Olympic's Motion to Dismiss] that led [Appellant Concrete] to decide to agree [to dismiss the Involuntary Petition] as opposed to its own waking up to the facts and saying we agree and this should be dismissed." [Jan. 25, 2016 Tr., 31;25, 32;1-3]; (vii) that "on this record, giving [Appellant Concrete] the benefit of the doubt, [Appellant Concrete] shot first and aimed later [and] [i]t may be worse than that, but that's what I think they did, and I believe that at a minimum the alleged debtor is entitled to reasonable attorneys' fees in contesting the petition" [Jan. 25, 2016 Tr., 41;22-25, 41;1-2]; and (viii) "it doesn't really sound like this is consent by the [Appellee] since the [Appellee] had to move to dismiss before

---

[21] Indeed, when Judge Drain questioned Appellant regarding its bankruptcy purpose for filing the Involuntary Petition, "trying to get a sense of whether [Appellant]…at least alleged a purpose beyond collection to this bankruptcy [case]", Appellant answered that its bankruptcy purpose for commencing the Involuntary Case was its "concern[]…[that] the money [loaned was] being dissipated and a belief that the money that the property was supposed to be utilized for has been transferred out of the corporate name, or at least transferred out of an entity…we have legitimate bankruptcy concerns." [Jan. 25, 2016 Tr., 21;8-21].

[Appellant] was persuaded to agree with [dismissing the case].  It doesn't seem to me to be the type of consent that [11 U.S.C. § 303] is referring to."  [Jan. 25, 2016 Tr., 31;9-13].

On January 26, 2016, Judge Drain entered the Dismissal Order, which *inter alia* dismissed Appellant's involuntary petition, awarded Appellee attorneys' fees and costs and further expressly found that "conditions for the commencement of an involuntary bankruptcy case under section 303 have not been satisfied and dismissal…is appropriate" and "dismissal of the Involuntary Petition is ***not on 'consent'*** for purposes of section 303(i) of the Bankruptcy Code, and the Alleged Debtor did not waive its right to judgment under 11 U.S.C. § 303(i)".  [Docket No. 28].

This appeal followed.[22]

## II      SUMMARY OF ARGUMENT

Appellant presents two issues[23] on this appeal, but both center on the correct interpretation and application of the term "on consent" in section 303 of the Bankruptcy Code.  Thus, Appellant is in essence arguing on this appeal one thing: the Bankruptcy Court's dismissal of the Involuntary Petition was on "consent" for purposes of section 303 of the Bankruptcy Code, because applying the plain meaning of that term requires a finding that both it and the Appellee agreed to dismiss,

---

[22] On February 4, 2016, Concrete filed its *Notice of Appeal* from the Dismissal Order with the Bankruptcy Court. [Docket No. 29].

On February 4, 2016, Concrete also filed *Appellant's Designation of Contents for Inclusion in Record of Appeal and Statement of Issues on Appeal* [Docket No. 30], wherein Appellant stated both of its issues on appeal as specifically pertaining to 11 U.S.C. § 303(i): (a) whether dismissal of the Involuntary Petition was on "consent" for purposes of section 303(i); and (b) "whether…the Alleged Debtor…waive[d] its right to judgment under 11 U.S.C. § 303(i)."

On February 5, 2016, Olympic filed and served its "Notice of Intent to Pursue Damages Under 11 U.S.C. § 303(i)(2)". [Docket No. 32].  However, no action has subsequently been taken, partly due to Appellant's Notice of Appeal.

On February 19, 2016, Appellee filed a *Statement of Olympic Property Partners, LLC* [Docket No. 34] in response to Appellant's *Notice of Appeal* arguing that same sought the appeal of an interlocutory order and thus required that Appellant file a motion for leave to appeal, which was not done.

Also, on February 19, 2016, Appellee filed *Appellee's [Counter-] Designation of Additional Contents for Inclusion in Record on Appeal*.  [Docket No. 35].

[23] *See* Appellant Concrete's *Designation of Contents for Inclusion in Record of Appeal and Statement of Issues on Appeal* [Docket No. 30].

such dismissal was on consent for purposes of the statute, and thus this Court should reverse Judge Drain's Dismissal Order which awarded Appellee fees and costs.

However, for the reasons that follow, this Court should not reverse, but rather affirm the Dismissal Order and find that the Bankruptcy Court's dismissal of the Involuntary Petition was not on "consent" for purposes of 11 U.S.C. § 303(i).  *First*, as highlighted by the Bankruptcy Court, the better and sounder line of extant 11 U.S.C. § 303 jurisprudence supports affirming the Dismissal Order and the Bankruptcy Court's interpretation of "consent".  *Infra*, IV(A).  *Second*, applying the plain meaning interpretation of the term "consent" in 11 U.S.C. § 303 under the circumstances of this case results in absurd consequences which must under well-settled rules of statutory interpretation be avoided, and which may be avoided by employing the Absurd Result Principle or golden rule of statutory interpretation.  Infra, IV(B).    *Third*, abstention and dismissal of the involuntary petition was appropriate under 11 U.S.C. § 305(a), was raised and argued for in Appellee's Motion to Dismiss and Appellant consented to such abstention in its eleventh-hour responsive papers to Appellant's Motion to Dismiss.  Infra, IV(C).  Finally, f*ourth*, even applying Appellant's suggestion that this Court look solely to the ordinary, common or plain meaning of "consent", the Dismissal Order should still be affirmed in that consent can only be provided to another's proposal or motion, but not to one's own proposal or motion; thus, as the Appellee's Motion to Dismiss is, by definition and finding of the Bankruptcy Court, that of the Appellee, Appellee cannot have consented to itself, and thus no consent for purposes of section 303 of the Bankruptcy Code may be found here.

## III    APPLICABLE STANDARD OF REVIEW

Findings of fact are reviewed for clear error, and generally speaking, findings that involve questions of law or mixed questions of fact and law are reviewed de novo.  *In re United States Lines, Inc.*, 197 F.3d 631, 640-41 (2d Cir. 1999).

**IV**     **ARGUMENT**

   **A. Extant 11 U.S.C. § 303 Jurisprudence supports the Bankruptcy Court's Interpretation of "Consent" and its Resulting Order Granting Alleged Debtor's Motion to Dismiss, Dismissing the Petition and Awarding Fees and Costs**

*Purpose of Section 303 of the Bankruptcy Code*

   Involuntary bankruptcies, as presently provided under 11 U.S.C. § 303, have a long history in the United States, and during the course of that history the "seemingly high burdens on creditor initiation of involuntary cases have been substantially curtailed" and "the ease with which creditors may file petitions" increased.[24] Due to the fact that filing an involuntary petition may have serious consequences for a debtor, among others, section 303 of the Bankruptcy Code "is replete with details regarding involuntary filings…[including] safeguards against frivolous or malicious filings."[25]   Specifically, section 303(i) provides protection for the debtor from frivolous or inappropriate involuntary filings[.]"[26]   Judicial antipathy to the increase of baseless involuntary filings and increased litigation and attention to 11 U.S.C. § 303 have prompted courts to put prospective petitioning "creditors" and their counsel on notice that involuntary filings should be undertaken carefully and warning that failure to do so will result in consequences.[27]   Thus, section 303 provides creditors access to the bankruptcy courts and serves as a check on that access when abused.

   Addressing the Dismissal Order with the above context in mind, Appellant is correct that the Bankruptcy Court was sensible in affording the term "consent" the meaning it did, finding that

---

[24] COLLIER ON BANKRUPTCY ¶ 303.LH (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("[a]mong other things, the Code eliminated the reference to provability, limited the categories of ineligible debtors and abolished the 'acts of bankruptcy…' [and] replac[ed] a balance sheet insolvency test and chang[ed] the definition of equitable insolvency").
[25] *Id*. at ¶ 303.01.
[26] *Id*. at ¶ 303.33.
[27] *Id*. at ¶ 303.33[1] *citing In re Stern*, 268 B.R. 390 (Bankr. S.D.N.Y. 2001); and *In re Grossinger*, 268 B.R. 386 (Bankr. S.D.N.Y. 2001). As the court observed in *Stern*, 268 B.R. at 395, "Sanctions are assessed, and the decision here and in *In re Grossinger* are published, to give notice to the bar and future petitioning creditors that sham involuntary petitions may not be filed in this court without consequences."

"dismissal of the Involuntary Petition [was] not on "consent" for purposes of section 303(i) of the Bankruptcy Code, and [Appellee] did not waive its right to judgment under 11 U.S.C. § 303(i)[.]" [Docket No. 28].

A sensible reading of 11 U.S.C. § 303 and the jurisprudence surrounding it suggests that the purpose of subsection 303(i) and (j)(2), which both include the term "on consent of all petitioners and the debtor", is to restrict the petitioner from engaging in collusion with the alleged debtor to effectuate a dismissal of the petition along voluntarily withdrawing its petition with or without consent of the alleged debtor to protect the debtor's other creditors from inside dealings and collusion among one or more of the petitioning creditors and the alleged debtor that may lead to seeking a consensual withdrawal.[28]

Appellant and Appellee do not dispute that a debtor must satisfy the following three elements to obtain a judgement against a petitioning creditor under 11 U.S.C. § 303(i): "(1) the court must have dismissed the involuntary petition; (2) the dismissal must be other than on **consent** of all the petitioners and the debtor; and (3) the debtor must not have waived the right to a § 303(i) claim."[29]  Neither do the parties dispute that the first and third elements have been met in this case. [App. Docket No. 8, p. 15].

However, as to the second element, Appellant argues that the term "consent" is to be interpreted in accordance with its plain meaning, regardless of absurdity of the result of such interpretation and "regardless of the timing or manner with regard to which such consent was expressed."  [App. Docket No. 8; FN12].  Appellant would like that "no effort … be made by a

---

[28] Commercial Bankruptcy Litigation § 4:37, *citing In re All Media Properties, Inc.*, 5 B.R. 126, 144–45, 6 Bankr. Ct. Dec. (CRR) 586, 2 Collier Bankr. Cas. 2d (MB) 449 (Bankr. S.D. Tex. 1980), *order aff'd*, 646 F.2d 193 (5th Cir. 1981) (overruled on other grounds by, *In re Trusted Net Media Holdings, LLC*, 550 F.3d 1035, 50 Bankr. Ct. Dec. (CRR) 254, 61 Collier Bankr. Cas. 2d (MB) 292, Bankr. L. Rep. (CCH) P 81366 (11th Cir. 2008)).
[29] *In re Express Car & Truck Rental, Inc.*, 440 B.R. 422, 430 (Bankr. E.D. Pa. 2010) (*citing In re R. Eric Peterson Construction*, 951 F.2d 1175, 1179 (10th Cir. 1991); *In re Diloreto*, 388 B.R. 637, 646–647 (Bankr. E.D. Pa. 2008); and *In re Kelton Motors, Inc.*, 121 B.R. 166, 185 (Bankr.D.Vt.1990) (emphasis added)).

court to apply any independent analytical 'common sense' or an otherwise 'logical' approach…" [App. Docket No. 8, p. 24]. On the other hand, both Appellee and the Bankruptcy Court agree that "consent", though not specifically defined by the Bankruptcy Code, should be interpreted in a manner which not only yields a rational and logical result in the context of section 303 of the Bankruptcy Code, but also follows the better-reasoned interpretation given to that term by a dominant number of bankruptcy courts and other federal courts. Appellee and the Bankruptcy Court disagree with Appellant and are in agreement with each other that dismissal of the Involuntary Petition was **not** on "consent" of all the petitioners and the debtor as that term has been and should be interpreted and applied.[30]

The proper interpretation of "other than on consent" found in 11 U.S.C. § 303(i) is not well-settled by courts in the Second Circuit.[31] The issue has received scant discussion by the New York federal courts. Nonetheless, bankruptcy courts in other jurisdictions have taken different tacks in interpreting the term.[32] The most recent of these decisions (besides for the Bankruptcy Court in this case) was *In re Express Car & Truck Rental, Inc.*, 440 B.R. 422 (Bankr. E.D. Pa. 2010), a chapter 7 involuntary case commenced by a single petitioning creditor. *Id.* at 425. Debtor's counsel contacted petitioner soon after the filing of the petition and informed her that

---

[30] Judge Drain found that "[i]t doesn't really sound like this is consent by the debtor since the debtor had to move to dismiss before your client was persuaded to agree with that. It doesn't seem to me to be the type of consent that 303(i) is referring to. [Jan. 25, 2016 Tr., 31;9-13].

[31] Indeed, the only court in the Second Circuit to discuss consent under § 303(i) is the Bankruptcy Court for the District of Vermont in *In re Kelton Motors Inc.*, 121 B.R. 166 (1990). That court found that a debtor's "reservation of right to a § 303(i) judgement necessarily qualified [the debtor's] consent to the dismissal of the involuntary petition in the first place…" *Id* at 187.

[32] The Tenth Circuit Court of Appeals (*In re R. Eric Peterson Const. Co., Inc.*, 951 F.2d 1175 (1991)), the Bankruptcy Court for the District of Vermont (*In re Kelton Motors Inc.*, 121 B.R. 166 (1990)), the Bankruptcy Court for the Eastern District of Virginia (*In re Jett*, 206 B.R. 407 (1997)), the Bankruptcy Court for the Northern District of Iowa (*In re Tichy Elec. Co.*, 332 B.R. 364 (2005), and the Bankruptcy Court for the Eastern District of Pennsylvania (*In re Express Car & Truck Rental, Inc.*, 440 B.R. 422 (2010)) have put aside the plain meaning of "consent" in favor of a meaning leading to a more common sense result, while the Eastern District of Pennsylvania (*In re International Mobile Advertising Corp.*, 117 B.R. 154 (1990) and the Bankruptcy Court for the District of Delaware (*In re Analytica Wire, Inc.*, 392 B.R. 618 (2008)) applied the plain meaning to the statute.

there were significant flaws and deficiencies in her involuntary petition. *Id*. at 428. Shortly thereafter and in private conversation with debtor's counsel, the petitioner invited a discussion as to a global settlement of her claims, noting that she was willing to voluntarily dismiss the petition on the basis of her acknowledgment that there were an insufficient number of petitioning creditors that signed the petition and the claim upon which her petition was based was subject to a bona fide dispute. *Id*.

Despite this discussion, petitioner took no action to withdraw or otherwise dismiss the involuntary petition. *Id*. at 429. In the meantime, the alleged debtor filed a motion to dismiss and further sought fees under 11 U.S.C. § 303(i). *Id*. The court granted dismissal of the petition. *Id*. Petitioner then argued that the alleged debtor should not be awarded fees under section 303(i) of the Bankruptcy Code because petitioner did not oppose the motion to dismiss, thereby rendering the court's dismissal thereof on consent of both parties, barring any entry of an award of attorney's fees under § 303(i). *Id*. at 430.

The court found otherwise and granted the alleged debtor's request for fees under 11 U.S.C. § 303(i), finding that although from a purely technical standpoint the petitioning creditor and the alleged debtor agreed that the petition should be dismissed, this was not the type of consent contemplated by § 303(i). *Id*. at 431. The court provided the following rule in association with interpreting the term "consent" for purposes of 11 U.S.C. § 303: "once a debtor reserves the right to seek damages under § 303(i), that reservation qualifies the debtor's consent and therefore, the dismissal of the case is *not* "on consent of *all* petitioners *and* the debtor." *Id.* at 431 (emphasis in original).

The court also pointed out the absurdity that would result from a plain meaning interpretation of the statute. *Id.* 430-431. The court stated that "based on its text § 303(i) can be

read to preclude recovery of attorney's fees if a debtor or petitioning creditor merely acquiesces to or does not oppose a motion to dismiss." *Id.* at 430.  The court found this alternate

> construction of the statute illogical because it would require a debtor "to oppose the petitioner's motion to dismiss, even though doing so prolongs the period that the involuntary bankruptcy remains pending, accentuates the prejudice caused by the involuntary petition, and prevents actual recovery until after the dismissal, which the debtor really favors but is artificially being forced to oppose." Thus, "[a] debtor should not be required actively to oppose dismissal of an involuntary bankruptcy in order to preserve a claim for damages under section 303(i) if that petition was wrongfully brought.

*Id.* at 431, *quoting In re R. Eric Peterson Const. Co., Inc.*, 951 F.2d 1175, 1180 (10th Cir. 1991).

Additionally, the court found that § 303(i) is a fee shifting provision which turns generally on the merits of the litigation.  *Express Car & Truck Rental*, 440 B.R. at 431, *citing  In re S. Cal. Sunbelt Developers, Inc.*, 608 F.3d 456, 462 (9th Cir. 2010).  As such, the plain meaning interpretation of the statute, which would result in a preclusion of an award of attorney's fees when there is a mere acquiescence or non-opposition to dismissal of an involuntary petition which was wrongfully brought, is "at odds with the purpose of § 303(i)." *Id.* at 431.

The purposes of § 303 in the bankruptcy code is to give creditors access to the bankruptcy process through the filing of involuntary petitions. COLLIER ON BANKRUPTCY ¶ 303.LH (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  Recognizing the potential for abuse, the general prejudice of the bankruptcy process and the relative ease of commencement of an involuntary case, Congress included § 303(i) as a check on the improper use of the involuntary petition.  *Id.* at ¶ 303.33.  What kind of check would it be if all a petitioning creditors that brought an improper petition must do to defeat a claim under § 303(i) is to acquiesce to a debtor's motion to dismiss the involuntary petition at the last moment?  *See In re Express Car & Truck Rental, Inc.*, 440 B.R. 422, 431 (Bankr. E.D. Pa. 2010) (holding that such an interpretation of the statute is illogical and

contrary to the purpose of the statute).  The debtor would have already suffered the prejudice of the involuntary petition, including through the expenditure of potentially large sums to oppose and defeat same, though the petitioner would be permitted to escape unscathed, with a second bite at the apple in another forum where he continues to pursue the same underlying claims.[33]  This is an absurd result.  *Id.*

*Express Car & Truck* bases its findings of law on *In re R. Eric Peterson Const. Co., Inc.*, 951 F.2d 1175 (10th Cir. 1991). In *R. Eric Peterson*, the court was faced with a petitioning **creditors'** unopposed motion to dismiss. *Id.* at 1177.  The court applied a common sense meaning to the word "consent," rejecting the plain meanings other bankruptcy courts and district courts have given that term. *R. Eric Peterson* found that:

> [a] debtor should not be required to actively oppose dismissal of an involuntary bankruptcy in order to preserve a claim for damages under section 303(i) if that petition was wrongfully brought. A more passive statement of nonopposition … should not indicate consent, at least where … the debtor simultaneously manifests its intention to seek damages under section 303(i).

*Id*. at 1180.  The court refused to define consent using the plain meaning of the word since such an interpretation would lead to absurd results.  *Id.*  In essence, a debtor who wishes to preserve its rights to recovery under § 303(i), when faced with a motion to dismiss brought by petitioning creditors, would be required to artificially take actions to prolong the period spent in involuntary bankruptcy, which would accentuate the prejudice already caused by the involuntary petition (which, as explained above, is what § 303(i) is attempting to remedy).  *Id.*  Additionally, such an interpretation of "consent" under the statute would require the bankruptcy court to waste its already scarce resources holding a hearing where neither party wished the case to proceed.  *Id*. The court

---

[33] This was the reasoning Judge Drain used in his finding in this case. He stated:  "You know, you could in essence as counsel says have a dry run, see what happens, and force the debtor to spend money and then decide whether to consent, you know, without any risk…"  [Jan. 25 Tr. 32;12-17].

further held "that construing consent in this manner to require such actions against self-interest by the debtor leads to a 'ridiculous result.'" *Id.*

<u>Application of Extant Jurisprudence to the Instant Case</u>

The facts and circumstances of the instant case present even more compelling reasons to find that the Dismissal Order was not "on consent of all the petitioners and the debtor", as same is contemplated under § 303(i). *Express Car & Truck Rental* and the instant case are similar in the following ways: (i) both are involuntary bankruptcy cases commenced by a single petitioning creditor[34]; (ii) in both cases the petition was deficient in that it was not brought by three or more petitioning creditors with qualified claims which are not the subject to a bona fide dispute[35]; (iii) in both cases the debtor brought a motion to dismiss the petition which was granted without opposition from the petitioner[36]; and (iv) in both cases petitioner asserted that the dismissal was on consent of all petitioners and the debtor.[37]

However, unlike *Express Car & Truck Rental*, where the petitioner informed the debtor of its willingness to dismiss the petition before the debtor filed its motion to dismiss[38], in our case until Appellant Concrete filed its Statement on January 18, 2016 [Docket No. 22], the Involuntary case was hotly contested and heavily litigated and there was no indication that Appellant Concrete planned any course other than the intense prosecution of its Involuntary Petition and Trustee Appointment Motion. Concrete filed the Involuntary Petition and its Trustee Appointment Motion, Olympic filed various motions including (i) its extensive and comprehensive Motion to Dismiss; (ii) Motion to Extend; and (iii) Motion to Shorten. [Docket Nos. 8-17]. Only in the

---

[34] *In re Express Car & Truck Rental, Inc.*, 440 B.R. 422, 425 (Bankr. E.D. Pa. 2010), and Docket No. 1 (the Involuntary Petition).
[35] *Express Car & Truck Rental* 440 B.R. at 428, and Jan. 25 Tr. p. 25.
[36] *Express Car & Truck Rental* 440 B.R. at 430, and Docket No. 22 (petitioner's statement consenting to dismissal).
[37] *Express Car & Truck Rental* 440 B.R. at 430, and App. Docket 8.
[38] *Express Car & Truck Rental* 440 B.R. at 428.

eleventh hour (it being just one week prior to the January 25, 2016 hearing), did Concrete acquiesce to the dismissal of the Involuntary Petition.

If the facts and circumstances in *Express Car & Truck Rental* supported a finding that dismissal there was not on consent of all petitioners and the debtor[39], the facts and circumstances of the instant case surely support the Bankruptcy Court's finding that dismissal was not on consent of all petitioners and the creditor.[40]

Furthermore, at the January 25, 2016 hearing, although maintaining its position that the petition was improper and should be dismissed, Appellee's counsel agreed with the court and clearly stated that Appellee did not consent to dismissal for purposes of 11 U.S.C. § 303(i):

> THE COURT: And on the consent point you're not – you're not consenting in the sense that you're asserts [sic] your claim to fees, right? You're asserting your claim under 303(i) to fees.
>
> MR. SILVERMAN:  Correct. Correct.

[Jan. 25, 2016 Tr., 10;11-15].  The above conforms with the finding of *Kelton Motors*,[41] the only other court in the Second Circuit to discuss the interpretation of the word consent in § 303(i). Accordingly, the Bankruptcy Court was correct in its finding that the type of consent contemplated under § 303(i) was not present in this case.

Cases Appellant Cites: Distinguished

Appellant relies on two cases in arguing that the word consent as used in § 303(i) should be given its plain meaning: *In re Analytica Wire, Inc.*, 392 B.R. 618 (Bankr. D. Delaware 2008) and *In re International Mobile Advertising Corp.*, 117 B.R. 154 (Bankr. E.D. Pa. 1990), *affirmed*

---

[39] *Express car & Truck Rental* 440 B.R. at 431.
[40] Jan. 25 Tr. p. 44.
[41] *In re Kelton Motors Inc.*, 121 B.R. 166 (Bankr. D. Vt. 1990) (finding that a debtor's "reservation of right to a § 303(i) judgement necessarily qualified [the debtor's] consent to the dismissal of the involuntary petition in the first place…").

1991 WL 156588 (E.D. Pa. 1991).  However, as discussed below, the facts of both of these cases are distinguishable from those of the instant case.

In *Analytica Wire*, the petitioner filed an involuntary petition in the District of Delaware (the "Delaware Petition") and two days later filed an identical petition in the District of Columbia (the "DC Petition").  *Analytica Wire* 392 B.R. at 619.  No party initially objected to the Delaware Petition, as the debtor was unaware of same and was defending the DC Petition.  *Id.*  Thereafter, both the petitioner and the debtor each filed their own motions to dismiss the Delaware Petition; both agreeing to proceed with the DC Petition only and agreeing to dismiss the Delaware Petition. *Id.*  at 620.  At the hearing on the motions counsel for both the debtor and the petitioner were in agreement that the parties agreed on the issue of dismissal.  *Id.*  Upon those facts the court found that "both the [debtor] and the Petitioner agreed on, and even advocated for, the course of action ultimately taken … [t]his amounts to 'consent' as the term is used in § 303(i)."  *Id.* at 621.

Similarly, in *International Mobile*, a motion to dismiss an involuntary petition was filed jointly by the debtor and the sole petitioning creditor.  *International Mobile,* 117 B.R. at 155.  The motion was granted without opposition while the debtor reserved its rights to damages under § 303(i).  *Id.*  The court found that the mere reservation of § 303 rights does not allow the debtor to recover thereunder, if the petition was dismissed on consent of all of the petitioners and the debtor. *Id.* at 157.  Importantly, the fact that the motion was a jointly made and unopposed, led the court to find that both petitioner and debtor consented to dismissal.  *Id.*

However, in our case Appellee moved on its own Motion to Dismiss, not a joint motion and when Appellee so moved, Appellant was vigorously prosecuting the Involuntary Case, rather than indicating non-opposition to it.  The Bankruptcy Court found that it was the Appellee's Motion to Dismiss (not Appellant's own realization) that prompted the Appellant's Statement of

Consent.[42]  Section 303(i) of the Bankruptcy code shifts the burden of an inappropriately filed involuntary petition to petitioner (away from debtor).  *In re S. Cal. Sunbelt Developers, Inc.*, 608 F.3d 456, 462 (9th Cir. 2010).  Appellant "shot first and aimed later."  [Jan. 25, 2016 Tr., 41;24]. There was no bankruptcy purpose in filing the involuntary petition, Appellant was merely attempting to collect on a loan and Appellant felt that pressuring Appellee with the Involuntary Petition would result in collection. [Jan. 25, 2016 Tr., p. 41].  Appellant's sudden about-face, acquiescence or "consent" to the dismissal was for no other reason than to avoid the punishing purpose of § 303(i), escape unscathed with an opportunity at a second bite at the apple in the State Court Litigation after wounding Appellee in the Bankruptcy Court.  *Id.*  Judge Drain saw through this veil and refused to allow this, and so should this Court.

Accordingly, the Bankruptcy Court was correct in its determination that the dismissal of the petition was other than on consent of all the petitioners and the debtor, and the Dismissal Order should be affirmed in its entirety.

## B.  Plain Meaning of a Statute Must be Ignored Where Consequence of Application Thereof Results in Absurdity

*The Absurdity Principle*

Our legal system is largely dependent upon the "venerable principle that a law will not be interpreted to produce absurd results."[43]

> The common sense of man approves the judgment mentioned by Puffendorf that the Bolognian law which enacted, "that whoever drew blood in the streets should be punished with the utmost severity," did not extend to the surgeon who opened the vein of a person that fell down in the street in a fit. The same common sense accepts the ruling, cited by Plowden, that the statute of 1st Edward II, which enacts that a prisoner who breaks prison shall be guilty of

---

[42] "So and it's probably that motion that led your client to decide to agree as opposed to its own waking up to the facts and saying we agree and this should be dismissed."  [Jan. 25, 2016 Tr., 32;1-3].

[43] Veronica M. Dougherty, *Absurdity and the Limits of Literalism: Defining the Absurd Result Principle in Statutory Interpretation* 44 AM. U. L. REV. 127 (1994).

felony, does not extend to a prisoner who breaks out when the prison is on fire—"for he is not to be hanged because he would not stay to be burnt." And we think that a like common sense will sanction the ruling we make, that the act of Congress which punishes the obstruction or retarding of the passage of the mail, or of its carrier, does not apply to a case of temporary detention of the mail caused by the arrest of the carrier upon an indictment for murder.

— *United States v. Kirby*[44]

The above principle is known as the "Absurd Result Principle" and has also been referred to as the "golden rule of statutory interpretation."[45]   In statutory interpretation this golden rule provides an ancient, well-founded and firmly-accepted exception to the general rule that a statute should be interpreted according to its plain meaning.[46]  The golden rule entered the jurisprudence of the U.S. Supreme Court as early as 1819.[47]  In fact, the Supreme Court has absolutely subscribed

---

[44] 74 U.S. (7 Wall.) 482, 487 (1868), adopted again with approval in *KMart Corp. v. Cartier, Inc.*, 486 U.S. 281,325 (1988) (Scalia,J., concurring in part and dissenting in part).

[45] Veronica M. Dougherty, *Absurdity and the Limits of Literalism: Defining the Absurd Result Principle in Statutory Interpretation* 44 AM. U. L. REV. 127, 135 (1994).

[46] *See, e.g., Wansey v. Perkins*, 135 Eng. Rep. 55, 63 (C.P. 1845) (Cresswell,J.) ("It may be laid down as a safe rule, in the construction of acts of parliaments, that we are to look at the words of the act and to render them strictly, unless manifest absurdity or injustice should result from such a construction."); *Perry v. Skinner*, 150 Eng. Rep. 843, 845 (Ex. 1837) (Parke, B.) ("The rule by which we are to be guided in construing acts of Parliament is to look at the precise words, and to construe them in their ordinary sense, unless it would lead to any absurdity or manifest injustice."); *Becke v. Smith*, 150 Eng. Rep. 724, 726 (Ex. 1836) (Parke, B.) (stating "useful rule" that courts adhere to ordinary meaning of statute unless interpretation "leads to any manifest absurdity or repugnance"); *see also Public Citizen*, 491 U.S. at 470 (Kennedy, J., concurring) ("When used in a proper manner, this narrow exception to our normal rule of statutory construction does not intrude upon the lawmaking powers of Congress, but rather demonstrates a respect for the coequal Legislative Branch, which we assume would not act in an absurd way."); *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504,527 (1989) (Scalia,J., concurring) (declaring that when literal interpretation produces absurd result, it is task of Court to give some alternative meaning to statute); *Armstrong Paint &Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315,333 (1938) ("[T]o construe statutes so as to avoid results glaringly absurd, has long been a judicial function."); J.A. Corry, *Administrative Law and the Interpretation of Statutes,* 1 U. TORONTO LJ. 286, 299-300 (1936) (noting development of absurdity exception to literalism and citing cases).

In 1765, Blackstone made several references to absurdity as justifying either a deviation from literal meaning or the voiding of an act of Parliament with regard to absurd consequences. He noted: "As to the effects and consequence [of statutes], the rule is, that where words bear either none, or a very absurd signification, if literally understood, we must a little deviate from the received sense of them." 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *61 (1st ed. 1765) [hereinafter BLACKSTONE'S COMMENTARIES]. Later in the same volume, when describing the principal "rules to be observed with regard to the construction of statutes," id. at *87, Blackstone noted: "[I]f there arise out of [acts of parliament] . . . any absurd consequences, manifestly contradictory to common reason, they are, with regard to those collateral consequences, void," id. at *91.

[47] *See Sturges v. Crowninshield*, 17 U.S. 122, 202-03 (1819) (discussing absurdity as justifying departure from plain meaning of words); *see also United States v. Kirby*, 74 U.S. 482, 486 (1868) (arguing that statutory terms should be interpreted to avoid "injustice, oppression, or an absurd consequence").

to the Absurd Result Principle in numerous cases, deviating from even the clearest statuary text whenever a given application of plain meaning of that text would otherwise produce "absurd" results.[48] "[E]ven interpretive literalists" cleaving to strict textualism recognize that if the result of strict interpretation is absurd, "interpreter is free (we would say compelled) to depart in the direction of sense."[49]

The term "absurd", in the context of the golden rule or Absurd Result Principle, "represents a collection of values, best understood when grouped under the headings of reasonableness, rationality, and common sense."[50] Based on those values, courts reject as unacceptable those outcomes that are "absurd," "unjust," "oppressive," "nonsensical," "ridiculous," "an affront to common sense," "unthinkable," "bizarre," or "ridiculously inconsistent with reason or the dictates of common sense", whenever the literal interpretation of a statute would otherwise result in those outcomes.[51]

---

[48] See, e.g., *Clinton v. City of New York*, 524 U.S. 4I7, 429 (1998); *Pub. Citizen v. U.S. Dep't of Justice*, 49I U.S. 440, 454-55 (1989); *Green v. Bock Laundry Mach. Co*., 490 U.S. 504, 527 (1989) (Scalia, J., concurring) (rejecting literal interpretation of Federal Rule of Evidence 609(a)(1) because it would produce absurd result) *Jackson v. Lykes Bros. S.S. Co*., 386 U.S. 73I, 735 (1967); *United States v. Brown*, 333 U.S. 18, 27 (1948); *Armstrong Paint & Varnish Works v. Nu-Enamel Corp*., 305 U.S. 3I5, 333 (1938); *Sorrells v. United States*, 287 U.S. 435, 447-49 (1932); *United States v. Katz*, 271 U.S. 354, 362 (1926); *Hawaii v. Mankichi*, 190 U.S. 197, 213-14 (1903); *Church of the Holy Trinity v. United States*, 143 U.S. 457, 465, 472 (1892); *Kirby*, 74 U.S. (7 Wall.) at 487.

[49] *Central States, S.E. & S.W. Areas Pension Fund v. Lady Baltimore Foods*, 960 F.2d 1339, 1345 (7th Cir. 1992) (Posner, J.) *cert. denied*, 113 S. Ct. 179 (1992).  Indeed, the Marshall Court, which was known as entrenched in the primacy of the text in matters of statutory interpretation, made clear that a court's obligation to the text ceased when "the absurdity and injustice of applying the provision to the case, would be so monstrous, that all mankind would, without hesitation, unite in rejecting the application."  *Sturges v. Crowinshield*, I7 U.S. (4 Wheat.) 122, 203 (1819); *see also United States v. Bright*, 24 F. Cas. 1232, 1235 (C.C.D. Pa. 1809) (No. I4,647) ("In most cases it will be found that the soundest and safest rule by which to arrive at the meaning and intention of a law is to abide by the words which the lawmaker has used. If he has expressed himself so ambiguously that the plain interpretation of the words would lead to absurdity, and to a contradiction of the obvious intention of the law, a more liberal course may be pursued.").

[50] Veronica M. Dougherty, *Absurdity and the Limits of Literalism: Defining the Absurd Result Principle in Statutory Interpretation*, 44 AM. U. L. REV. 127, 133 (1994).

[51] Veronica M. Dougherty, *Absurdity and the Limits of Literalism: Defining the Absurd Result Principle in Statutory Interpretation*, 44 AM. U. L. REV. 127, 133, 135, 141, 150, 153-57 (1994).

Accordingly, the Absurd Result Principle, rooted in the rule of law and rule of law values, acts as a check on the statutory law.[52]  This Court therefore need not restrict itself to the plain meaning interpretation of the term "consent" found in 11 U.S.C. § 303, but rather must consider the Absurd Result Principle as well.

In doing so, *Green v. Bock Laundry Machine Co.*[53] is instructive.  In *Green v. Bock Laundry*, the Supreme Court dealt with a statute (Federal Rule of Evidence 609(a)[54]), which all nine Justices regarded as being unworkable as written, and as meaning something other than what its plain language stated.[55]  The statute addressed the admissibility of evidence of prior convictions for the purpose of impeaching a witness.  *Id*.  The statute provided, inter alia, the mandatory admission of such evidence if "the court determines that the probative value of admitting th[e] evidence outweighs its prejudicial effect to the ***defendant***."[56]

As written, the rule did not specify whether it applied to civil trials, criminal trials, or both, and the question presented to the Supreme Court was whether the rule applied to civil trials, and, if so, whether it provided for a balancing of prejudice to the civil defendant, but provided no such benefit to the plaintiff.[57]

---

[52] Veronica M. Dougherty, *Absurdity and the Limits of Literalism: Defining the Absurd Result Principle in Statutory Interpretation*, 44 AM. U. L. REV. 127, 133 (1994).

[53] 490 U.S. 504 (1989).

[54] FED. R. EVID. 609(a) (1988) (appearing as promulgated in 1987, *see* 28 U.S.C. app. 759 (1988), but amended in 1990 as reflected in 28 U.S.C. app. 537 (Supp. II 1990).

> Federal Rule of Evidence 609(a) then provided:
> For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.

*Id.*

[55] Id. at 511 (stating that Rule 609(a)(1) "can't mean what it says" *quoting Campbell v. Greer*, 831 F.2d 700, 703 (7th Cir. 1987)).

[56] FED. R. EVID. 609(a)(1).

[57] 490 U.S. at 505 (questioning whether Rule 609(a)(1) may be interpreted to benefit civil litigants). The rule has since been amended, and though it, as amended in 1990, still contained a balancing test, it provided different test for

The court of appeals interpreted the rule in accordance with its plain meaning to apply in both civil and criminal trials, and permitted the court to balance prejudice only for defendants. However, the Supreme Court found that, so interpreted, the rule required that a judge balance the prejudice to a civil defendant against the probative value of admitting into evidence its felony conviction, but left a judge no discretion to balance prejudice to a civil plaintiff, mandating admission of a plaintiffs felony convictions on the issue of credibility whenever the slightest probative value presented. The Supreme Court stated that the rule's plain meaning compel[s] an odd result in a case like this";[58] essentially resulting in the mandatory admission of impeachment evidence detrimental to a civil plaintiff, while providing a civil defendant the benefit of a balancing test.[59]

The Court stated that it "cannot accept an interpretation that would deny a civil plaintiff the same right to impeach an adversary's testimony that it grants to a civil defendant."[60] It called such a result "unfathomable," potentially "unjust and even bizarre," and "ridiculous",[61] concluding that, as far as civil trials were concerned, Rule 609(a)(1) "'can't mean what it says.'"[62] Therefore, after an examination of the background of the rule, the Court affirmed the appellate ruling, holding that Rule 609(a)(1) required a judge "to permit the impeachment of a civil witness with evidence of prior felony convictions regardless of ensuant unfair prejudice to the witness or the party offering the testimony," because the balancing test of Rule 609(a)(1) was only intended to protect from unfair prejudice the defendant in a criminal trial, and not a civil case. *Id*. at 523-24 and 527.

---

witnesses generally than for an "accused" as a witness. FED. R. EVID. 609(a) (amended 1990). The word "defendant" was dropped from the rule. *Id.*

[58] *Bock Laundry,* 490 U.S. at 509-10.

[59] *Id.*

[60] *Id.*

[61] *Bock Laundry,* 490 U.S. at 510.

[62] *Id.* at 511, *quoting Campbell v. Greer*, 831 F.2d 700, 703 (7th Cir. 1987)).

Even Justice Scalia, a textualist himself, issued a concurring opinion that similarly called the results of Rule 609(a)'s plain meaning "absurd," "unthinkable," and "bizarre," contending that the rule "cannot have been meant literally." *Id*. at 527-28 (Scalia, J., concurring). Therefore, there was unanimity on at least one point: the plain meaning of the statute must be rejected and some reworking of the words Congress passed into law were necessary.[63] Accordingly, the Absurd Result Principle justifies departures from interpretations based on the text of the statute, and the fact that a strict textualist like Justice Scalia has endorsed this principle, suggests something about literalist theories of interpretation; while textualism purports to hold the text as the primary, if not sole, source of a statute's meaning, it acknowledges something as primary even to text, that is, non-absurdity, rationality or common sense.[64] In this manner, application of the plain meaning principle and the Absurd Result Principle are not mutually exclusive binary options available to the judiciary in interpreting and applying statutes, but rather simultaneously existing in dynamic tension, with each other, each essential to and each complementing each other as part of the legal system.[65]

### Appellant's Argued for Interpretation of 11 U.S.C. § 303(i) will Result in Absurd Consequences

In the context of this instant appeal, Appellant would have this Court find that the plain meaning interpretation of the term "consent" as used in 11 U.S.C. § 303 is appropriate, despite the fact that interpreting same in strict conformity with its plain meaning results in an absurd and bizarre consequence. Indeed, it would be most odd if a sole petitioning creditor could commence an involuntary petition against a company, be found by the bankruptcy court to have failed to

---

[63] *Bock Laundry,* 490 U.S. at 527 (Scalia, J., concurring) (stating that the task before the Court was to give some alternative meaning to the statute in order to avoid absurd result).

[64] Veronica M. Dougherty, *Absurdity and the Limits of Literalism: Defining the Absurd Result Principle in Statutory Interpretation*, 44 AM. U. L. REV. 127, 158 (1994).

[65] Veronica M. Dougherty, *Absurdity and the Limits of Literalism: Defining the Absurd Result Principle in Statutory Interpretation*, 44 AM. U. L. REV. 127, 165 (1994).

satisfy the conditions for commencement of said involuntary bankruptcy case under section 303 of the Bankruptcy Code, moved further for the appointment of a chapter 11 trustee to take over said company's business operation, and otherwise place said company (now an alleged debtor) in the unenviable position of having to expend considerable resources in litigating an involuntary petition, and affirmatively filing a motion to dismiss, moving for other relief, inclusive of an extension of the automatic stay and for shortening notice of time upon which such motions may be heard, and opposing the aforesaid motion for appointment of a trustee, only to then be noticed after the aforesaid has taken place and only one week prior to the scheduled hearing on all the aforesaid that it (in this case the Appellant) suddenly acquiesces to the alleged debtor's motion to dismiss and thereby kiboshes an otherwise valid claim under 11 U.S.C. § 303(i) for fees and damages on the basis that such acquiescence constitutes "consent" as used in section 303 of the Bankruptcy Code.

Such a result is absolutely at odds with the purpose of section 303 of the Bankruptcy Code, which provides creditors access to the bankruptcy courts but also serves as a check on that access when abused. Though providing a creditor with the "extreme remedy" of an involuntary petition "with serious consequences to the alleged debtor", 11 U.S.C. § 303 also tempers such remedy and consequence with safeguards against frivolous malicious or inappropriately commenced filings."[66] Thus, in the words of Justice Scalia, the avid textualist, an interpretation of the term "consent" under 11 U.S.C. § 303, which provides the frivolous, malicious or inappropriate petitioning creditor the ability to unilateral render toothless the precise mechanism in 11 U.S.C. § 303 designed

---

[66] COLLIER ON BANKRUPTCY ¶¶ 303.01 and 303.33  (Alan N. Resnick & Henry J. Sommer eds., 16th ed.); *and In re Stern*, 268 B.R. 390 (Bankr. S.D.N.Y. 2001); and *In re Grossinger*, 268 B.R. 386 (Bankr. S.D.N.Y. 2001). As the court observed in *Stern*, 268 B.R. at 395, "Sanctions are assessed, and the decision here and in *In re Grossinger* are published, to give notice to the bar and future petitioning creditors that sham involuntary petitions may not be filed in this court without consequences."

to temper that petitioning creditor's improper conduct, despite its abuse of that statute is absolutely absurd, unthinkable and bizarre.  Where such a consequence results, the Court is not only free (but compelled) to depart from the plain meaning to avoid such absurdity.

Clearly in this case such departure is necessary.  This Court should find, as did the Bankruptcy Court, that "it doesn't really sound like this is consent by the [Appellee] since the [Appellee] had to move to dismiss before [Appellant] was persuaded to agree with [dismissing the case.  It doesn't seem to me to be the type of consent that [11 U.S.C. § 303] is referring to."  [Jan. 25, 2016 Tr., 31;9-13].  Thus, whatever "consent" does mean, and whatever is necessary and/or sufficient for the appropriate finding of "consent" for purposes of 11 U.S.C. § 303, the circumstances before the Court on this record cannot be it; cannot be what Congress intended nor what rule of law permits.

## C. Bankruptcy Court's Dismissal Order Should be Affirmed as Abstention was an Independently Appropriate Ground Upon Which to Premise Dismissal of Appellant's Involuntary Petition

The Bankruptcy Court's Order should also be affirmed for the additional reason that abstention was and is appropriate.  Appellee Olympic's Motion to Dismiss was made pursuant not only to 11 U.S.C § 303 but also § 305 and Appellant Concrete, in its Statement of Consent [Docket No. 22] made in response to Appellee's Motion to Dismiss, expressly consented to abstention. The court's abstention power under 11 U.S.C. § 305 is arguably of greatest significance as a check upon the misuse of the liberal standards for creditor relief under section 303 of the Bankruptcy Code.[67]

---

[67] Commercial Bankruptcy Litigation § 4:30 (Even after the 1984 Amendments, the ground for relief under 11 U.S.C. § 303 represents a far more liberal rule than the requirement imposed under prior law that the petitioning creditors plead and prove commission of an "act of bankruptcy" within four months prior to the filing. *See* Bankruptcy Act of 1898, ch. 541, § 3(a), (b), 30 Stat. 544, 546 (1898). While these more relaxed standards arguably serve to allow creditors to better protect their interests in the debtor's assets, resort to the abstention power simultaneously allows the court to exercise some discretion when the particular facts of the case nevertheless militate against the advisability of a bankruptcy court proceeding.)

A bankruptcy court may, in its discretion, abstain from and dismiss a case pursuant to 11 U.S.C. § 305(a)(1).[68] Bankruptcy courts[69] have utilized the following factors in evaluating whether the interests of creditors and the debtor would be better served by abstention and dismissal under 11 U.S.C. § 305 (a)(1):

1) the economy and efficiency of administration;

2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;

3) whether federal proceedings are necessary to reach a just and equitable solution;

4) whether there is an alternative means of achieving an equitable distribution of assets;

5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;

6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and

7) **the purpose for which bankruptcy jurisdiction has been sought**.

**The Seventh Factor**

The last factor is the most important in evaluating a motion for abstention and dismissal pursuant to 11 U.S.C. § 305(a)(1).[70]  Furthermore, placing great emphasis on the last factor is consistent with Congress' legislative intent in its promulgating 11 U.S.C. § 305(a)(1), where with

---

[68] 11 U.S.C. § 305(a)(1) provides that "(a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if- (1) the interests of creditors and the debtor would be better served by such dismissal or suspension[.]"

[69] *In re TPG Troy, LLC*, 492 B.R. 150, 160 (Bankr. S.D.N.Y. 2013); *In re Persico Contracting and Trucking, Inc.*, 2010 WL 3766555, at *4 (Bankr. S.D.N.Y. 2010); *In re Mt. Dairies, Inc.*, 372 B.R. 623, 634 (Bankr. S.D.N.Y. 2007); *and In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 464 (Bankr. S.D.N.Y. 2008).

[70] *In re Persico Contracting and Trucking, Inc.*, 2010 WL 3766555, at *4 (Bankr. S.D.N.Y. 2010); and *In re Mt. Dairies, Inc.*, 372 B.R. 623, 634 (Bankr. S.D.N.Y. 2007) (stressing clearly that "[t]he bankruptcy court is not a collection agency."); *and see In re TPG Troy, LLC*, 492 B.R. 150, 160 (Bankr. S.D.N.Y. 2013) ("[w]hile all factors are considered, not all are given equal weight in every case… [t]he decision to abstain under § 305(a)(1) should be made on a case-by-case basis).

respect to same it is written that **"the prototypical fact pattern under section 305(a)(1)" involves efforts by recalcitrant creditors to commence involuntary cases to gain leverage over and extract more favorable treatment from debtors.**[71]

Thus, though abstention determinations are performed on a case-by-case basis, all agree that where recalcitrant creditors commence involuntary cases to gain leverage over and extract more favorable treatment from debtors, abstention and dismissal under 11 U.S.C. § 305(a)(1) is generally appropriate, particularly where petitioners pursue in bankruptcy court the exact same claims that they are pursuing in another venue.[72]  The importance of the abstention power and its overall check on improperly pursued bankruptcy cases is even more  underscored in light of the increased access creditors have to the bankruptcy courts through 11 U.S.C. § 303.

In *In Re Mt. Dairies*, Judge Morris concluded that the involuntary filing was pursued and commenced by (in essence) a single creditor, rather than the act of the debtor's creditor-body at-large, with the intent to use the bankruptcy court to collect on an obligation the creditor believed the alleged debtor owed.[73]  So too here, in this Involuntary Case, the Petitioner is acting alone (not in conjunction with the debtor's creditor-body at-large) with the intent of collecting on the Loan that the Petitioner believes the Alleged Debtor owes.[74]  In light of Judge Morris' finding, Judge Morris concluded that the normal reasons for filing a bankruptcy petition were absent and the appropriate forum for adjudication of the parties' dispute in that case was federal non-bankruptcy court.  *Id*.  Judge Morris so held notwithstanding petitioner's representations that such federal non-

---

[71] H.R Rep. No. 95-595, 95th Cong., 1st Sess. 325 (1977); S.Rep. No. 95-989, 95th Cong., 2d Sess. 35 (1979); *and* Collier on Bankruptcy ¶ 305.02[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

[72] *Id*.; *and In re TPG Troy, LLC*, 492 B.R. 150, 160 (Bankr. S.D.N.Y. 2013) (after finding that the "Petitioners are pursuing the same exact claims in… [an]other venue[] that they are pursuing in this Court", "it is questionable whether the bankruptcy proceeding was filed for a proper purpose (factor 7)." and abstention under section 305(a) is warranted).

[73] *In re Mt. Dairies, Inc.*, 372 B.R. 623, 634-36 (Bankr. S.D.N.Y. 2007).

[74] *Id*.; *accord In re Persico Contracting and Trucking, Inc.*, 2010 WL 3766555, at *5 (Bankr. S.D.N.Y. 2010) (discussing Judge Morris' decision in *In re Mt. Dairies*).

bankruptcy proceedings had proceeded too slowly for petitioner's liking and the petitioner was otherwise unhappy with its results there.[75]

In this case, Appellee Olympic argued in its Motion to Dismiss that Appellant Concrete lacked an appropriate bankruptcy purpose or objective for filing the Involuntary Petition and that the petition further failed to comply with the requirements of 11 U.S.C. § 303. [Docket No. 12, pp. 39-41]. The Appellee argued that Appellant's sole objective in filing the Involuntary Petition was to use the bankruptcy court to collect on an obligation Appellant Concrete believed Appellee Olympic (the Alleged Debtor) owed. In other words, Appellant Concrete's motivation fits squarely within the "the prototypical fact pattern under section 305(a)(1)": an effort by recalcitrant Appellant Concrete (creditor) to commence this Involuntary Case to gain leverage over and extract more favorable treatment from Appellee Olympic (debtor) into paying monies Concrete claimed it was owed under the loans.

In this case, Judge Drain expressly found that "on this record, giving [Appellant Concrete] the benefit of the doubt, they shot first and aimed later. It may be worse than that, but that's what I think they did, and I believe that at a minimum the alleged debtor is entitled to reasonable attorneys' fees in contesting the petition." [Jan. 25, 2016 Tr., 41;22-25, 41;1-2]. Judge Drain further found that "[t]here were serious problems with the merits of the involuntary petition…[and]…this appears to me to be pretty clearly a case where it's a two-party dispute over a collection." [Jan. 25, 2016 Tr., 43;19-24]. Judge drain further found that: "there was really nothing here to benefit anyone other than [Appellant Concrete] when it had a pending action to enforce the debt in state court. [Jan. 25, 2016 Tr., 44;1-3]. Finally Judge Drain found that:

> [Appellant Concrete] doesn't particularly have much of an equities
> on its side, and indeed one can argue that **when looking to collect so
> obviously a criminally usurious claim in state court** [the Appellant-

---

[75] *Id.*; and  *In re TPG Troy, LLC*, 492 B.R. 150, 160 (Bankr. S.D.N.Y. 2013).

> Petitioner Concrete] might have concluded that putting the pressure on [Appellee-Alleged Debtor Olympic] in an involuntary two-party bankruptcy case would be a smart tactical move, although ultimately I think the creditor saw the light and decided it wouldn't be.

[Jan. 25, 2016 Tr., 44;15-21]. (emphasis added).

It has been held clearly time and again that the Bankruptcy Code and Bankruptcy Courts are not for the adjudication of a two-party private disputes that belong in state or other federal courts. Indeed, it has been expressly held that a bankruptcy court is compelled to abstain pursuant to 11 U.S.C. § 305 where there is "a two-party dispute for which the parties have adequate remedies in state court. The bankruptcy court is not a collection agency."[76]

Judge Drain expressly found that the Appellant failed to perform the necessary diligence and investigation required prior to commencing an involuntary petition. Specifically, Judge Drain said I believe that the Appellant "shot first, and aimed later [and] it may be worse than that". [Jan. 25, 2016 Tr., 41;22-25]. Furthermore, throughout Petitioner's multiple and voluminous pleadings which were filed in the Bankruptcy Court and are included in the current record on this appeal, Petitioner did not once point to an appropriate bankruptcy objective in filing the Involuntary Petition. Instead, Petitioner argued that its valid reason for filing the Involuntary Petitioner was that is was owned money, that it had a right to know where its money was and for what purpose the Alleged Debtor was using this money, and that the Alleged Debtor had not only failed to account for this money but had defrauded Petitioner through representations and omissions relating to Petitioner's provision of this money in the first place. Furthermore, when Judge Drain pressed Petitioner during oral argument for a legitimate bankruptcy purpose behind its Involuntary Petition, Petitioner essentially argued that it filed the Involuntary Petition to try and safeguard its money. [Jan. 25, 2016 Tr., 21;8-21].

---

[76] *In re Mt. Dairies Inc.*, 372 B.R. 623, 634 (Bankr. S.D.N.Y. 2007).

However, this reasoning, even if credited as an honest response by Petitioner, is unavailing to it, as in contrast to Appellant's assertion, the filing of an involuntary chapter 11 petition does not restrict the resulting alleged debtor from continuing to operate it business as usual, does not restrict the alienability of funds and property, and thus Petitioner's filing the Involuntary Petitioner in this case would not have forwarded its alleged goal of safeguarding its funds.

The fact remains that regardless of Petitioner's reasoning for filing the Involuntary Petition, the Involuntary Case was nothing more than a two-party dispute over a private contract, which does not and did not belong in bankruptcy court.  State and federal courts have broad, powerful and wide-reaching tools and mechanisms available to enjoin the dissipation of funds and other assets where the circumstances for the granting of such injunctions and exercising of such tools and mechanisms are appropriate.   The further fact remains that Petitioner commenced a state action on November 16, 2016, three days prior to filing its Involuntary Petition, and thus availed itself to a court of competence with the power to afford it the relief it sought if appropriate.  Instead of pursuing the Alleged Debtor in state court and applying there for injunctive relief after a showing that it was likely to succeed on the merits of its claim and satisfying the other required elements of the CPLR for injunctive relief, Petitioner sought a short-cut to what it hoped would be the Alleged Debtor's speedy payment.

Though the last factor is perhaps the most determinative, Appellee's Memorandum of Law in Support of Alleged Debtor's Motion to Dismiss robustly argued that the other factors additionally support abstention and dismissal under section 305 of the Bankruptcy Code.[77]

---

[77] As to the first and second factors, see discussion in Docket No. 12, pp. 38-39; and as to the third through fifth factors see discussion in Docket No. 12, pp. 39-40.

Therefore, even if this Court finds that the Bankruptcy Court inappropriately dismissed the Involuntary Petition under 11 U.S.C. 303(i), the Bankruptcy Court had ample legal authority and expressed adequate factual findings to have dismissed appropriately as a result of abstaining.

**V      CONCLUSION**

Based on the foregoing, the Appellee submits that the Bankruptcy Court Order should be afformed.  Accordingly, Appellant's Involuntary Petition should remain dismissed and Appellee should remain entitled to fees and costs.

Dated: May 4, 2016
          New York, New York

                              By:  /s/ Daniel E. Silverman
                                   Daniel E. Silverman, Esq.
                                   Albert Sardar, Esq.

                                   SILVERMAN & SARDAR LLP
                                   2 Rector Street, Suite 1203
                                   New York, New York 10006
                                   Telephone: (212) 321-3190

                                   *Counsel for Appellee*